UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JONATHAN TYLER DANZEY,

      Petitioner,

v.                                CASE NO. 8:23-cv-427-CEH-TGW
SECRETARY, Department of Corrections,

      Respondent.

_____/

# O R D E R

Jonathan Tyler Danzey filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254, along with a supporting memorandum of law. (Docs. 1, 4). Respondent filed a response opposing Danzey's petition along with supporting exhibits. (Doc. 5; Doc. 5, Appendix, Exs. 1–61). Danzey replied to the Respondent's response. (Doc. 6). Upon consideration, Danzey is entitled to no relief because his claims are procedurally barred or lack merit.

## I. Standard of Review

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this proceeding. *Wilcox v. Florida Dep't of Corr.*, 158 F.3d 1209, 1210 (11th Cir. 1998), *cert. denied*, 531 U.S. 840 (2000). Section 2254(d), which creates a highly deferential standard for federal court review of a state court adjudication, states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), explains this deferential standard:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 693 (2002). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). *Accord Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that we are to decide."). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

"The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell*, 535 U.S. at 694. A federal court must afford due deference to a state court's decision. "AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). *See also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

When the last state court to decide a federal claim issues a reasoned and explanatory opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("[A] federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable."). When the relevant state-court decision does not come with reasons for the decision, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192.

## II.  Statement of Relevant Facts[1]

Danzey was charged in the Sixth Judicial Circuit in Pinellas County, Florida, with attempted robbery with a weapon, specifically a knife. (Doc. 5, Exhibit ("Ex."). 3).[2] At his jury trial, the victim, Enoch Nicholson ("Nicholson"), testified on direct examination that:

On the evening of February 21, 2015, he attended the funeral of a friend and then went to downtown St. Petersburg, Florida, for dinner and drinks with his girlfriend, Christine, and his friend, Jeremy. (Ex. 15, pp. 177-178). Christine and Jeremy were drinking alcohol that night, but Nicholson was the designated driver and did not drink. Later in the evening, the three went to eat at a Waffle House on 54th Avenue in St. Petersburg. (*Id.* at 178). Christine had a little too much to drink, and after they ate, Nicholson took her outside and put her in the vehicle while Jeremy paid the bill. (*Id.* at 179). Upon exiting the Waffle House, Nicholson noticed a man with a hoodie over his head standing in front of their car. (*Id.* at 180, 187). After Nicholson put Christine in the passenger seat of the vehicle, the man with the hoodie began pacing back and forth in front of the vehicle. (*Id.* at 180). Nicholson locked the vehicle, stood by the passenger door, and waited. (*Id.* at 180–81). The man continued pacing for 30 to 45 seconds and then abruptly turned and walked around the front of the car

---

[1]  This statement of facts derives from the trial transcript and exhibits (Doc. 5, Exs. 14, 15).

[2]  Unless otherwise cited, the exhibits referred to in this Order can be found in the appendix to docket entry 5.

towards Nicholson, produced a knife, pointed the blade at Nicholson, and said, "Give me your shit." (*Id.* at 181–82). At this point, the man was five to seven feet from Nicholson, and nothing was obstructing his face. (*Id.* at 182). The lighting in the parking lot was very good. (*Id.* at 183). Nicholson noticed the knife and then looked up so that he could try to identify the person. (*Id.* at 182–83). Nicholson started backing away around the back of the vehicle and shouting, "This guy's trying to rob me, this guy's trying to rob me. Call 911." (*Id.* at 183–84). The man then ran off toward a nearby Knights Inn hotel. (*Id.* at 186–87).

Once Nicholson was out of immediate danger, he called 911 and provided a general description of his assailant and a description of the clothing his assailant was wearing. The assailant was wearing a gray "Buccaneers" hoodie, basketball shorts, and tennis shoes. (*Id.* at 190). The police arrived, canvassed the area, and had him view a person, but that person was "absolutely not" the person who had tried to rob him, and he told them that. (*Id.* at 191). Nicholson identified State's Exhibits 3 (a photo of a knife) and 8 (a knife) as the knife the man had pointed at him. (*Id.* at 189; Ex. 16, State's Exhibit 3).

Nicholson went to the local police department on February 25, 2015, and viewed a photo pack. (Ex. 15 at 191). He hesitated on two photos and believed there was a 65 percent resemblance between one of the photos and his assailant, but ultimately did not identify anyone in that photo pack as the person who attempted to rob him. The person who had attempted to rob him was not in that photo pack, and

he signed a form stating that he could not pick anyone out of that photo pack. (*Id.* at 192).

On February 27, 2015, a detective showed Nicholson a second photo pack. (*Id.* at 192–93). Nicholson identified the person who attempted to rob him in that photo pack, stated he was "100 percent" sure that it was the person who tried to rob him, and that he knew it as soon as he saw the photo. (*Id.*). Nicholson signed and dated the photo. (*Id.* at 193). Nicholson then identified Danzey in court as the person who attempted to rob him. (*Id.* at 194).

On cross-examination, Nicholson testified that the attempted robbery occurred around 4:00 a.m. (*Id.* at 198). He acknowledged that he had never seen the person who tried to rob him before and that only two to three seconds elapsed between the time the person showed him the knife and the time he started backing up. (*Id.* at 199). Nicholson testified that the first deputy to arrive, Deputy Daniel Negersmith, asked him to describe his assailant in as much detail as he could, and that he described his assailant as a white male, 25 to 30 years old, 155 pounds, and five-foot-eight to five-foot-ten inches tall. (I*d.* at 200). He testified that he had described his assailant's clothing as a light gray hoodie with "Buccaneers, established" and a year written on it, and blue or teal-colored shorts. (*Id.* at 200–01). He acknowledged that he told Deputy Negersmith that the blade of the assailant's knife was black, but he testified that he did not see the handle and was not able to describe it. (*Id.* at 202). He also acknowledged that he did not mention any scars or tattoos at that point. (*Id.*). He

testified he told Deputy Negersmith that he could not describe the assailant's hair length or hairstyle, but that he thought his hair was blonde. (*Id.* at 203). He testified that there were six photos in the first photo pack he was shown and that, after viewing the photo pack once, he asked to look at it again. (*Id.* at 204-205). He testified that after looking at it a second time, he pulled out photo number six and stated that he was 65 percent sure it was the man who committed the robbery. He then pulled out photo number one and said it also looked like the guy. (*Id.* at 205). He acknowledged that when he was shown the second photo pack two days after viewing the first photo pack, he said that photo number five "looks like the guy" and that "[h]is facial hair is similar, and his face is the same." (*Id.* at 205).

Sergeant Eugene Paniccia ("Paniccia") testified that he showed a photo pack to Nicholson on February 25, 2015. (*Id.* at 220–21). Sergeant Paniccia identified State's Exhibit 5 as the photo pack he showed to Nicholson. (*Id.* at 222–26). He testified that Nicholson asked to see it twice and was shown each photo a second time. (*Id.* at 225). He testified that Nicholson paused on the first and sixth photos and indicated that he thought photo six was sixty-five percent, but ultimately signed a form stating that he was unable to select any photo as being the person who attempted to rob him. (*Id.* at 225–26). The defense and the state stipulated that Danzey's photo was not included in the photo pack shown to the victim by Sergeant Paniccia. (*Id.* at 227–28).

Deputy Dominic Brissett testified that on February 27, 2015, he was dispatched to the area of a Racetrac, Waffle House, and Knights Inn on 54th Avenue in St. Petersburg at about 2:30 a.m. and came into contact with Danzey. (*Id.* at 236). Upon

making contact with Danzey, he realized that Danzey was wearing similar clothing to a description given of an attempted robbery suspect five days earlier. As a result, he searched Danzey and found a knife on him. (*Id.* at 237). Deputy Brissett identified State's Exhibit 3 as a photo of the knife he found on Danzey and State's Exhibit 8 as the actual knife. (*Id.* at 237–38).

On cross-examination, Deputy Brissett testified that Danzey was wearing a gray hoodie and black shorts when he encountered him on February 27, 2015. (*Id.* at 240). Deputy Brissett could not remember whether the writing on the hoodie said "Tampa Bay Football" or "Tampa Bay Buccaneers." (*Id.* at 241).

Detective Amy Plourde testified that she created a photo pack, which included a photo of Danzey. (*Id.* at 244–45). There were six photos in the pack, and Danzey was the fifth photo. (*Id.* at 245). The other photos were of people with similar physical characteristics. (*Id.* at 245–46). After creating the photo pack, she provided it to Detective Jason Loftus. (*Id.* at 246).

Detective Loftus testified that on February 27, 2015, he showed the photo pack to Nicholson at Nicholson's residence. (*Id.* at 247–50). Loftus identified State's Exhibit 6 as the photo pack that he showed to Nicholson. (*Id.* at 249). Loftus testified that Nicholson was shown the photos one at a time twice. (*Id.* at 251). Nicholson identified photograph number 5 as the person who attempted to rob him and signed and dated the photograph. (*Id.* at 251–52). On cross-examination, Loftus agreed that there was

a noticeable scar on Danzey's left cheekbone in the photo of him in the photo pack. (*Id.* at 277).

A guest log from the Knights Inn hotel on 54th Avenue was admitted into evidence, and the parties stipulated that the guest log showed that Danzey was a guest at the Knights Inn between February 20 and 27, 2015. (*Id.* at 287). The parties also stipulated that the case had previously been set for trial on July 6, 2016, that Danzey did not appear on that date, and that he was subsequently arrested in Las Vegas, Nevada, and returned to Pinellas County, Florida. (*Id.* at 288).

After the state rested its case, defense counsel moved for a judgment of acquittal, arguing that the state's evidence was insufficient to show that Danzey was the individual who committed the attempted robbery. (*Id.* at 288–90). The motion was denied. (*Id.* at 291).

## III.  Procedural History

Danzey was convicted as charged and sentenced to a minimum mandatory term of fifteen years in state prison as a prison releasee re-offender. (Exs. 15, 17, 18). The Second District Court of Appeal affirmed Danzey's conviction and sentence without a written opinion on September 21, 2018. (Ex. 24). *See Danzey v. State*, 257 So. 3d 963 (Fla. Dist. Ct. App. 2018). The court then denied rehearing on November 14, 2018. (Ex. 26).

On January 27, 2019, Danzey filed a *pro se* motion for post-conviction relief containing eight grounds, which the trial court construed as a motion filed under Rule

3.850, Federal Rules of Criminal Procedure. (Ex. 28). He filed three *pro se* amended motions (Exs. 31, 32, 34), and then obtained counsel and filed two more amended motions (Exs. 39, 41). The final amended motion raised one claim of ineffective assistance of counsel, divided into two parts, and stated that Danzey was withdrawing all grounds in his previous motions "except those raised herein." (Ex. 41, p. 6). The trial court denied the final amended motion without a hearing. (Ex. 45). The Second District Court of Appeal affirmed without a written opinion. (Ex. 49). *See Danzey v. State*, 334 So. 3d 315 (Fla. Dist. Ct. App. 2022). The appellate court issued its mandate on March 22, 2022. (Ex. 50).

On June 17, 2022, Danzey filed a petition for writ of habeas corpus in the Second District Court of Appeal, alleging ineffective assistance of appellate counsel. (Ex. 52). The court denied the petition on August 26, 2022. (Ex. 54).

On September 8, 2022, Danzey filed a motion to correct an illegal sentence, pursuant to Rule 3.800(a), Florida Rules of Criminal Procedure, arguing that the pocketknife he displayed during the commission of the offense was not actually a weapon. (Ex. 55). The motion was dismissed because the claim raised was not cognizable in a Rule 3.800 motion and would be untimely under Rule 3.850. (Ex. 56). The Second District Court of Appeal affirmed. (Ex. 60). *See Danzey v. State*, 2022 WL 17971693, at *1 (Fla. Dist. Ct. App. Dec. 28, 2022). The appellate court issued its mandate on February 6, 2023. (Ex. 61).

Danzey provided his instant federal petition (Doc. 1) to prison officials for mailing on February 22, 2023, and thus, it was timely filed. He raises four grounds for

relief in the petition, which are due to be denied as unexhausted and, therefore, procedurally barred, or meritless.

## IV. Exhaustion of State Remedies; Procedural Default

A federal habeas petitioner must exhaust his claims in state court before presenting them in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default states that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A fundamental miscarriage of justice occurs in an extraordinary case in which a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner shows prejudice by showing that "there is at least a reasonable probability that the result of the proceeding

would have been different" absent the constitutional violation. *Henderson*, 353 F.3d at 892.

## V. Discussion

### A. Ground One

Danzey raises three claims within Ground One, which are due to be denied as follows.

***Claim One:*** As his first claim, he argues that the trial court violated his constitutional right to confront a witness by not allowing his defense counsel to cross-examine Detective Loftus about a statement he made in his police report that the victim, Nicholson, had slurred speech when he viewed the photo pack. This claim was raised in the first ground of Danzey's initial brief on direct appeal (Doc. 5, Ex. 21), and so, it is exhausted. However, it has no merit.

The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right to cross-examine witnesses against him. *See Davis v. Alaska*, 415 U.S. 308, 316–317 (1974); *United States v. Mastin*, 972 F.3d 1230, 1239 (11th Cir. 2020). However, "the right to cross-examine 'is not unlimited.'" *Mastin*, 972 F.3d at 1239 (quoting *United States v. Garcia*, 13 F.3d 1464, 1468 (11th Cir. 1994)). "[T]he Confrontation Clause guarantees only '*an opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)) (emphasis in original). Moreover, "the Sixth Amendment only protects cross-examination that is *relevant*." *Jones v. Goodwin*, 982

12

F.2d 464, 469 (11th Cir. 1993) (quoting *Wasko v. Singletary*, 966 F.2d 1377, 1381 (11th Cir. 1992)) (emphasis in original). "For evidence to be relevant for impeachment purposes, it must actually contradict or impeach the witness's testimony at trial or evidence presented in the state's case." *Ivy v. Florida Dept. of Corr.*, 543 F. App'x 923, 928 (11th Cir. 2013) (citing *Jones v. Goodwin*, 982 F.2d 464, 469–70 (11th Cir. 1993)). "Once the Confrontation Clause has been satisfied by sufficient examination, 'further questioning is within the [trial] court's discretion.'" *Mastin*, 972 F.3d at 1239 (quoting *Garcia*, 13 F.3d at 1468). "When considering whether the Confrontation Clause has been satisfied . . . the jury's ability to assess the credibility of the witness is the decisive factor. The question 'is whether a reasonable jury would have received a significantly different impression of the witness's credibility had counsel pursued the proposed line of cross-examination.'" *Id.* at 1239–40 (quoting *Garcia*, at 1469).

Here, Detective Loftus testified at trial that he showed Nicholson a photo pack on February 27, 2015. (Ex. 15 at 247–50). Nicholson identified the person in photograph number 5 [Danzey's photo] as the one who attempted to rob him. (*Id.* at 251–52). On cross-examination, defense counsel asked Detective Loftus whether his role in presenting a photo pack included making observations of the individuals he was presenting it to, and Loftus responded that his role that day was to meet with Nicholson and show him a photo pack. (*Id.* at 255). Defense counsel then asked about the first two pages of Loftus's report, which contained general information about Nicholson, including a statement that Nicholson's speech was slurred. (*Id.*) The prosecutor then objected, asserting that the information on those pages was auto-

populated from prior reports and had not been written by Detective Loftus. (*Id.* at 255–56; Ex. 16 at 49–50). The jury was then removed from the courtroom, and defense counsel was permitted to proffer Detective Loftus' testimony relating to his report as follows:

BY [Defense Counsel]:

Q. Sir, you generated a police report in this case, correct?

A. Yes, sir.

Q. Okay. And the purpose of that report, of course, is to help you recollect what occurred on that given day; correct?

A. Yes, sir.

Q. Do you have any specific recollection, at all, of how -- what Mr. Nicholson's demeanor was like, how he acted, whether his speech was slurred, or anything like that?

A. He was very calm with me.

Q. But do you have any specific recollection, today, now, about that?

A. That if his speech was slurred or anything?

Q. Yes.

A. No, he didn't appear as if, at all. He seemed fine. He was calm.

Q. Okay. Your report says, under "speech," his speech was slurred.

A. Where is that?

Q. It's in your report, on page two.

A. Can you show that to me? What supplement number?

Q. Eleven.

14

A.  Eleven? Okay.

Are you familiar with our ACISS system?

Q.  I am.

A.  Okay. So what happens is, is when I attach individuals to the report -- meaning a person, a vehicle, an address, item of property -- it's whatever it was built, previously.

So if a deputy had originally built that individual, and put the comment as "slurred," it's whatever the previous entry was.

So we don't go in there and, you know -- there's no reason to change it. That's how it was built, originally. I don't go -- you don't go and look at those individual items.

Q.  So whoever wrote the first report and put "slurred" in, that would have been the person who observed his slurred speech?

A.  No. It could have been a previous contact in another report, whether he was a victim of another case, whether -- I don't know.

So, at some point, somebody built him in the ACISS system, not necessarily -- there's no way that I would be able to determine, without doing more research, to find out when, specifically, that comment was placed, or that icon was selected, within the ACISS system.

From this, there's no way to determine whether that was selected within my report. I can tell you, I never wrote that. So whatever the ACISS system populated, whether it was in this report or a previous report, it's in the ACISS system, but not anything that I put in regard to my supplement, specifically.

Q.  Okay. So if the report said he was fat, he was uncooperative, he was left-handed, he was not a U.S. citizen, and there was no photo of him, then that's how you would let your report be written?

A.  I clicked on this individual as a victim, sir, and imported it, and input it into my report, and that's what I put.

If the person was not identified, I would identify him in some which way, through either DAVID or some other means of identification purposes.

Q.  My question is, if you -- if you -- when you go to write your report, if the information that's in the report -- automatically put in -- is incorrect, then you take no steps to correct that information?

Do you see what I'm saying?

15

A.   I see what you're saying, but it had no bearing on the input portion that I did with this investigation.

Q.   So whether he had slurred speech or not, that day, had no import into him making the pick?

A.   He did not have slurred speech, as I explained.

Q.   You remember that specifically, that he did not?

A.   I would, yes.

Q.   You would, or you do?

A.   I do remember. And if, what I said -- if I -- if I noted that, I would have put that in my narrative.

Q.   Okay. So it would not be in the portion where it specifically asks for those items. You would put it in the narrative that he had slurred speech?

A.   Correct.

Q.   Okay.

(Ex. 15 at 260–63).

Other Pinellas County Sheriff's Office reports that were generated in this case on different dates were also entered into the record as a court exhibit, but were not presented to the jury. (*Id.* at 270–71, 273; Ex. 16 at 1–60). Each of those reports that contained victim information on page two included a statement that the victim's speech was slurred. (Ex. 16 at 5, 13, 18, 23, 50). When asked about this, Detective Loftus again explained that he simply imported information relating to the victim and did not type in that the victim's speech was slurred. (Ex. 15 at 274). The trial court ruled that defense counsel would not be permitted to question Detective Loftus about the word "slurred" being in his report because

Detective Loftus was not the person who entered it in the report, and, therefore, it was not relevant. (*Id.* at 276).

Based on Detective Loftus' proffered testimony, the trial court reasonably concluded that the statement in his report that Nicholson's speech was slurred was not relevant to impeach either Detective Loftus or Nicholson. It was not Detective Loftus who entered the statement in the report, and the statement did not relate to the time of Detective Loftus's interaction with Nicholson. The Second District Court of Appeal affirmed without an explanation. When the last state court rendering judgment affirms without explanation, a federal habeas court will presume it rests on the reasons given in the last reasoned decision. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590, 2594, 115 L.Ed.2d 706 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."). Detective Loftus's proffered testimony supports the trial courts' finding of a lack of relevance. Thus, the Second District Court of Appeal's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, and Danzey is entitled to no relief on this claim.

Even if the trial court's exclusion of such evidence violated the Confrontation Clause, Danzey is entitled to no relief because he cannot demonstrate prejudice. To be entitled to relief based on a Confrontation Clause violation, a federal habeas petitioner must demonstrate actual prejudice under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Al-Amin v. Warden Georgia Dep't of Corr.*, 932 F.3d 1291, 1302 (11th Cir. 2019) ("On

federal collateral review . . . we review an alleged Confrontation Clause error under *Brecht*'s actual prejudice standard."). The petitioner must show that "the error had substantial and injurious effect or influence in determining the jury's verdict." *Sec'y, Florida Dept. of Corr. v. Baker*, 406 Fed. Appx. 416, 425 (11th Cir. 2010) (quoting *Brecht*, 507 U.S. at 637). Nicholson identified Danzey both from the photo pack and at trial. Danzey cannot demonstrate that the limitation on his cross-examination of Detective Loftus had a substantial or injurious effect on his trial or influenced the jury's verdict. Therefore, Claim One of Ground One is denied.

   ***Claim Two:*** Danzey argues that the trial court violated his due process rights by allowing into evidence two photo packs that were highly suggestive because they contained photos of Hispanic males who did not resemble Danzey. Danzey did not present this claim to the state courts and, therefore, it is procedurally barred. Danzey did not move to suppress the photo pack identifications in the state trial court, And, although he argued on direct appeal that admission of the photo packs violated his due process rights because they were unnecessarily suggestive, he did not argue that they were unduly suggestive because they contained photos of Hispanic males who did not resemble Danzey. (*See* Doc. 5, Ex. 21, Point II). Instead, he argued that they were unnecessarily suggestive because the victim did not provide a sufficiently detailed description of the perpetrator before the photo lineups, was shown more than one photo pack, and the photo packs contained suspects who did not match the description given at the time of the incident. (*See id.*). Thus, Danzey failed to present (and exhaust) the specific claim that he raises now to the state courts, and he makes no showing of cause and prejudice

to overcome the procedural default of his claim, let alone a showing that a fundamental miscarriage of justice has occurred. Danzey's claim, as raised here, is unexhausted and procedurally barred. Claim Two of Ground One is, therefore, denied.

*Claim Three*: Danzey argues in his final claim of Ground One that his trial counsel was ineffective for not moving to suppress an out-of-court identification when there was a question of whether the victim was under the influence at the time that he viewed the photo pack and identified Danzey. Again, Danzey did not present his claim, as raised here, to the state courts and, thus, it is unexhausted and procedurally barred. Although Danzey argued on direct appeal that trial counsel was ineffective for not moving to suppress the photo pack identification, he did so on other grounds. (*See* Doc. 5, Ex. 21, Point III). He argued that trial counsel should have filed a motion to suppress because the photo packs were unnecessarily suggestive, not because there was a question of whether the victim was under the influence at the time that he viewed the photo pack. (*See id.*). Because he did not raise the same claim in the state courts that he raises here, his claim is unexhausted and procedurally barred. Danzey makes no showing of cause and prejudice to overcome the procedural default of his claim, let alone a showing that a fundamental miscarriage of justice has occurred. Claim Three of Ground One is, therefore, denied.

## B. Grounds Two and Three

In Grounds Two and Three, Danzey claims that his post-conviction counsel was ineffective in failing to properly amend his motion for post-conviction relief and

omitting claims that Danzey wished to raise. However, because there is no constitutional right to counsel in state post-conviction proceedings, these claims provide no basis for federal habeas relief. *See Coleman v. Thompson*, 501 U.S. 722, 752 (1991) (holding that there is no constitutional right to counsel in state post-conviction proceedings); *see also Lambrix v. Sec'y, Florida Dept. of Corr.*, 756 F.3d 1246, 1263 (11th Cir. 2014) (holding that a claim of ineffective assistance of post-conviction counsel does not provide a basis for relief); *Chavez v. Sec'y, Florida Dept. of Corr.*, 742 F.3d 940, 944 (11th Cir. 2014) ("The Supreme Court has long held that there is no constitutional right to counsel in post-conviction proceedings, even in capital cases, which necessarily means that a habeas petitioner cannot assert a viable, freestanding claim for the denial of the effective assistance of counsel in such proceedings."). Therefore, Grounds Two and Three are denied as meritless.

### C. Ground Four

In Ground Four, Danzey claims that his constitutional right to correct his sentence was violated. He asserts that a common pocketknife is exempt from the definition of weapon in section 790.001(13), Florida Statutes, and that he never used the pocketknife in a manner likely to cause death or serious bodily harm. Danzey argued through a motion to correct an illegal sentence filed with the trial court, and in his appeal from the denial of that motion, that his sentence was illegal and that a common pocketknife does not constitute a weapon. (*See* Doc. 5, Exs. 55, 59). However, he did not argue (and exhaust) any violation of his federal constitutional rights in those filings. Danzey makes no showing of cause and prejudice to overcome

the procedural default of his claim as raised here, let alone a showing that a miscarriage of justice has occurred. Thus, Danzey's federal constitutional claim raised in Ground Four is denied as unexhausted and procedurally barred.

## V. Conclusion

1. Danzey's petition for writ of habeas corpus (Doc. 1) is **DENIED**. The **CLERK** is directed to enter judgment against Danzey and to **CLOSE** this case.

2. Danzey is not entitled to a certificate of appealability ("COA"). Under Section 2253(c)(1), a prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his application. Instead, a district court must first issue a COA. Section 2253(c)(2) permits issuing a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." To merit a COA, Danzey must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001). Danzey has not made the requisite showing. Finally, because Danzey is not entitled to a certificate of appealability, he has no right to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on this 9th day of January 2026.

*Charlene Edwards Honeywell*
Charlene Edwards Honeywell
United States District Judge

**Copies to:** *Pro se* Petitioner; Counsel of record